## The inhabitants of WATERBOROUGH vs. The inhabitants of NEWFIELD.

Where the wife left her husband, and returned, with her children and furniture, to her father's house in the same town ; and the husband, not being suffered to follow her, and having no property, sought employment in a neighboring town, intending to return and dwell with his wife whenever she should be reconciled to him, which was afterwards effected ;—it was held that his domicil remained in the town where his family had continued to reside.

THIS was an action of *assumpsit* for reimbursement of the charges of the support of one *Elijah Smith.* The material facts, which were developed at the trial, and then stated in a case made by the parties, will be found in the opinion of the Court.

*Appleton,* for the plaintiffs, contended that the pauper gained a settlement by having his domicil in *Newfield* at the time of the passage of *Stat.* 1821, *ch.* 122. *Putnam v. Johnson,* 10 *Mass.* 501. He had the *jus domi,* and freedom from arrest, in the house of Dr. *Ayer.* *Oyster v. Shead,* 13 *Mass.* 520. Any residence, however short, was sufficient. *The Venus,* 8 *Cranch,* 279. He had acquired the right to vote, and was eligible to office, and liable to do military duty, in *Newfield ;* from which place, moreover, he had no present intention of removing. And he had no right to dwell in any other house. *Cambridge v. Charlestown,* 13 *Mass.* 501 ; *Abington v. Boston,* 4 *Mass.* 312 ; *Green v. Buckfield,* 3 *Greenl.* 136 ; *Dixmont v. Biddeford, ib.* 202 ; *Boothbay v. Wiscasset, ib.* 356. Had he

died, on or before the passage of the act of *March* 21, 1821, in the neighboring county of *Cumberland*, the Judge of Probate in that county would not have had jurisdiction to grant administration on his estate. *Cutts v. Haskins*, 9 *Mass.* 547 ; *Harvard College v. Gore*, 5 *Pick.* 370 ; *Holyoke v. Haskins*, *ib.* 20 ; *Hallowell v. Saco*, 5 *Greenl.* 143.

*J. & E. Shepley*, for the defendants, cited *Gorham v. Canton*, 5 *Greenl.* 266 ; *Turner v. Buckfield*, 3 *Greenl.* 229 ; *Knox v. Waldoborough*, *ib.* 455 ; *Hampden v. Fairfield*, *ib.* 436 ; *Richmond v. Vassalborough*, 5 *Greenl.* 396.

MELLEN C. J. delivered the opinion of the Court at the ensuing *July* term in *Waldo*.

*Smith*, the pauper, resided in *Shapleigh* from about the year 1816 till the spring of 1820, in a hired house, with his family. At that time a misunderstanding took place between him and his wife. He absented himself several weeks from the house where he lived, and his wife and the children went to her father's house in that town, and caused the furniture to be removed to that place, though the person employed to remove it, was forbidden so to do by the husband. Soon after this the house they had occupied was removed to another place, and was never afterwards occupied by *Smith* or any of his family. The husband was forbidden by *Wood*, the wife's father, to come to his house ; the wife was unwilling that he should come and he never did, for about two years, nor until after a reconciliation had taken place. After the separation, the husband lived some time at his father's in *Shapleigh* ; afterwards, a short time, in *Waterborough*, and in *November*, 1820, he went to Dr. *Ayer's*, in *Newfield*, and resided with him till 4th of *April*, 1821, and worked for *Ayer* to pay a debt he was then owing him. He testified that he never intended to abandon his family, but always meant to return to them, when he should be permitted so to do. That he never furnished them any supplies, though he should have furnished them with necessaries, if he could have been permitted. And that he did not know that he should ever be permitted to go back and live with her at her father's ; but that he had some hope of living

with her again.  This is a compressed summary of the facts on
which our decision must be founded.  We may add that it does not
appear that they ever had any fixed home in *Shapleigh* after the re-
conciliation ; they lived a few weeks at her father's, and after his
removal to *Waterborough* they remained several months in *Shap-
leigh* and then removed to *Limerick.*  The question is, where was
the pauper's domicil on the 21st of *March,* 1821.  On that day
he was in the employment of Dr. *Ayer* in *Newfield,* and his wife
and children were residing in *Shapleigh,* at her father's house, and
in possession of the furniture belonging to the husband, which had
been removed from the house they had lately occupied.  It is a
well settled principle of law that if a man leaves his family and home
for months or years, *animo revertendi,* his domicil is not changed
by such absence so long as such intention continues ; and this in-
tention must be ascertained from a view and consideration of all
circumstances.  It is true that while he was residing at *Newfield,*
he had no house in the town of *Shapleigh* which he then had a
right to enter ; but his wife and children were in that town ; and he
never intended to abandon them, but always meant to return to them
as soon as he could ; and the case finds that a reconciliation took
place, and he carried his intention into execution as soon as he was
able to do it.  A man domiciled in a particular town, will continue
to have his domicil there, though he may own no real estate, nor
occupy any.  He may live as a boarder ; he and his family may
live as boarders and still retain their domicil.  The misunderstand-
ing between the pauper and his wife, led to the separation, and pov-
erty caused her removal to her father's ; and his poverty rendered
him unable to procure another dwelling where he could live with
her, as he testified he was desirous to live.  These facts seem to
indicate no intention to change the domicil, more than was mani-
fested by the pauper in the case of *Richmond v. Vassalborough,*
cited and relied upon as decisive of the case at bar.  We have par-
ticularly examined the facts of that case and find a strong resem-
blance between the two.  In both, the paupers left their families in
consequence of a misunderstanding with their wives ; in both there
was no absolute desertion of their families, but a conditional inten-

tion of returning to them and living with them again ; in both a re-conciliation took place, and a consequent reunion of the parties, though not until after the 21st of *March,* 1821. In *Richmond v. Vassalborough,* the court considered the reunion as a degree of evi-dence of the original intentions of the husband, proper for the con-sideration of the jury ; and as the court in the present case, are by consent of parties, authorized to draw all inferences which a jury might properly draw, we may consider the subsequent reconciliation as evidence of the sincerity of the pauper's declarations as to his hope and intention of again living with his wife and children, who continued to reside in *Shapleigh* as before mentioned. In *Rich-mond v. Vassalborough,* the pauper during his absence, furnished some small supplies to his wife; and in the present case he was de-sirous of doing the same, had he been permitted so to do. In *Rich-mond v. Vassalborough,* the wife deserted the house in which she and her husband had lived together, and on her return from *China,* unlawfully broke into an empty house and there resided ; so that in that case, as well as in the one before us, the former habitations of the husband and wives prior to their separation, had ceased to be their rightful homes, and indeed they had no new places of settled habitation until after their reunion. On the whole, we perceive no material distinction between the two cases, and the same legal prin-ciples must be applicable to both.

According to the agreement of the parties a nonsuit must be en-tered, with costs for the defendants.